IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DANIEL MACARTHUR WILSON,          )
                                  )
          Plaintiff,              )
                                  )
v.                                )
                                  )   CASE NO. 2:20-CV-353-WKW-CSC
                                  )
                                  )
JOHN CROW, et. al.,               )
                                  )
          Defendants.

## <u>RECOMMENDATION OF THE MAGISTRATE JUDGE</u>

## I.     INTRODUCTION

On May 28, 2020, Daniel MacArthur Wilson, an indigent state inmate housed at Easterling Correctional Facility, filed this 42 U.S.C. § 1983 action[1], alleging that the Defendants treated him with deliberate indifference when they failed to adequately treat his nausea, dehydration and breathing problems and delayed treatment for his broken arm. (Doc. 13). He amended his complaint to allege that he was served Jello containing spider parts when he was housed in the prison infirmary. (Doc. 17). Later he amended his complaint to complain of a rash in his genital area that went untreated and to generally allege that he was not protected from individuals affected with COVID-19 while housed at Easterling. (Doc. 37). The named Defendants in this action include John Crow, Warden; Officer Pope[2]; Nurse, Jessica Junghans; Nurse, Shandreka Faulk; and

---

[1] On May 27, 2020, Wilson filed another § 1983 action stating numerous unconstitutional conditions claims against Warden John Crow and other Correctional Defendants at the Easterling Correctional Facility. *See, Wilson v. Crow, et al.,* 2:20-cv-348-RAH-CSC.

[2]  The record confirms that Officer Pope was misidentified and never properly served. (Doc. 40). Inspite of the Court's direction, Plaintiff failed to properly identify any correctional officer, who had been misnamed Officer Pope, upon whom service could be completed. (Doc. 41). Thus, Warden John Crow is the sole Correctional Defendant in this action.

Dr. Manuel Pouparanis.  He seeks money damages, his freedom[3] and declaratory and injunctive

relief "to close Easterling prison down."[4]  (Doc. 13 at p. 4).

     The Defendants filed special reports (Docs. 31, 36, 42, 48, 57, 58, 67, 73, 77, 79), which

included relevant evidentiary materials in support of these reports, including affidavits addressing

the claims presented by Wilson, and medical and prison records.  In these documents, Defendants

deny the claims against them.  Specifically, Defendant Dr. Pouparinas the interim Medical Director

at Easterling Correctional Facility, filed an affidavit which summarized the Plaintiff's medical

records and addressed his claims of medical deliberate indifference.  (Doc. 31-1 at pp. 1-8).

Likewise, Defendant John Crow, Warden III at Easterling Correctional Facility filed affidavits

denying Plaintiff's claims.  (Docs. 67-1, 73-1 and 77-1)  Warden Crow also affirmed the testimony

of Ruth Naglich, Associate Commissioner for Health Services for ADOC, concerning the policies

adopted by ADOC to keep inmates safe from COVID-19 infection, (doc. 79-1 at pp. 1-16), and

attested that it was followed at Easterling to keep Plaintiff and other inmates safe from COVID-

19 infection.  (Doc. 77-1 at pp. 1-2).

---

[3]  The law is clear; a claim for release from custody may not be addressed in a 1983 action. Rather, this claim for relief may only be addressed in a petition for habeas corpus. *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973).  Indeed, in *Heck*, the Supreme Court held that claims challenging the legality of a prisoner's conviction or sentence are not cognizable in a 42 U.S.C. § 1983 action "unless and until the conviction or sentence is reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus" and complaints containing such claims must therefore be dismissed. *Heck* v. *Humphrey*, 512 U.S. 477, 489 (1994).  Thus, *Heck* confirms that "[h]abeas corpus is the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement and seeks immediate or speedier release." 521 U.S. 481, citing *Preiser,* 411 U.S. 475 (1973).  Therefore, summary judgment is due to be granted on Plaintiff's cursory claim for release from custody.

[4]  The record shows that Plaintiff has been released from custody and now resides at a free-world address. (Doc. 95).  Under Eleventh Circuit precedent "a transfer or a release of a prisoner from prison will moot that prisoner's claims for injunctive and declaratory relief." *Smith v. Allen*, 502 F. 3d 1255, 1267 (11th Cir. 2007), *abrogated on other grounds by Sossamon v. Texas,* 563 U.S. 277 (2011); see also, *Zatler v. Wainwright,* 802 F. 2d 397, 399 (11th Cir. 1986) (per curium.).  Accordingly, Plaintiff's claims for injunctive and or declaratory relief are due to be dismissed.

After reviewing the special reports and exhibits, the court issued an order on March 12, 2021, requiring Wilson to file a response to the Defendants' special report, supported by affidavits or statements made under penalty of perjury and other evidentiary materials.  This order specifically cautioned that "**unless within fifteen (15) days from the date of this order a party . . . presents sufficient legal cause why such action should not be undertaken** . . . the court may at any time [after expiration of the time for the plaintiff filing a response to this order] and **without further notice to the parties** (1) treat the special reports and any supporting evidentiary materials as a motion for summary judgment and (2) after considering any response as allowed by this order, rule on the motion for summary judgment in accordance with the law." (Doc. 80 at p. 3).

Wilson filed responses to this order.  (Docs. 81, 59 and 47).  In his responses, attempts to bring new claims, which were not plead in his complaint, as amended.  For example, he makes cursory conditions claims (Doc. 81 at p. 3) and claims for deliberate indifference to safety. (Doc. 81 at pp. 10-18).  However, these claims are not properly before the court because claims may not be raised for the first time in a response to a motion for summary judgment.  *San Francisco Residence Club, Inc. v. Baswell-Guthrie,* 897 F. Supp. 2d 1122, 1214 (N.D. Ala. September 13, 2012).

The complaint, as amended, is clear; Plaintiff claims the Defendants treated him with deliberate indifference when they failed to adequately treat his nausea, dehydration and breathing problems and delayed treatment for his broken arm.  (Doc. 13).  He also claims that his Eighth Amendment rights were violated when he was served Jello containing spider parts while housed in the prison infirmary.  (Doc. 17).  He also alleges he had a rash in his genital area that went untreated and generally that he was not protected from individuals affected with COVID-19 while

housed at Easterling.  (Doc. 37). Thus, these are the only claims properly before the court for consideration at this time.

Pursuant to the directives of the order entered on March 12, 2021, the court now treats the Defendant's special report and supplements thereto as a motion for summary judgment and concludes that summary judgment is due to be granted in favor of the Defendants.

## II.  SUMMARY JUDGMENT STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. . . . [A dispute] is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party asking for summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and alerting the court to portions of the record that support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, once the movant has satisfied this burden, the nonmovant is similarly required to cite portions of the record showing the existence of a material factual dispute. *Id.* at 324. To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In determining whether a genuine dispute for trial exists, the court must view all the evidence in the light most favorable to the nonmovant and draw all justifiable inferences from the evidence in the nonmoving

party's favor. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *see* Fed. R. Civ. P. 56(a).

To establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor. *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and pro se complaints are entitled to liberal interpretation, a pro se litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard v. Banks*, 548 U.S. 521, 525 (2006); *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, Wilson's pro se status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. The court has undertaken a thorough and exhaustive review of all the evidence contained in the record. After such review, the court finds that Wilson has failed to demonstrate a genuine dispute of material fact in order to preclude entry of summary judgment in favor of the Defendants.

## III.  DISCUSSION

### A.  FACTS

Plaintiff claims that during his incarceration at Easterling Correctional Facility, Defendants treated him with deliberate indifference when they failed to adequately treat his nausea and dehydration, delayed treatment for his broken arm, and served him Jello containing spider parts when he was housed in the prison infirmary. He also claims that the Defendants were deliberately

indifferent to a rash in his genital area that went untreated and failed to protect him from COVID-19 infected inmates. (Docs. 13, 17, and 37). He names Warden John Crow as the sole Correctional Defendant. He names as Medical Defendants Dr. Manuel Pouparanis and Nurses Jessica Junghans and Shandreka Faulk. All Defendants deny the claims against them.

Defendant Dr. Pouparanis filed an affidavit which summarized the Plaintiff's medical records and addressed his claims of deliberate indifference. He states as follows:

> I am a medical doctor licensed to practice medicine the state of Alabama. I am employed by Wexford Health Sources, Inc. Wexford holds the contract with the ADOC to provide health care related services to Alabama state inmates.

> I am the interim Medical Director at the Easterling Correctional Facility located in Clio, Alabama. I have seen and I have reviewed the legal Complaints filed by Alabama state inmate Daniel Macarthur Wilson (AIS # 260779). I am aware that Mr. Wilson alleges that on April 14, 2020, while in the health care unit, that he bid down on "some spiders" in his Jello that he was provided as part of a liquid diet. I am aware that Mr. Wilson alleges that myself and the nurses that were present at the time were deliberately indifferent providing him Jello with spiders.

> I am also aware that Mr. Wilson alleges that on June 18, 2020, that he fell over and fractured his arm and that he did not receive sufficient and/or adequate medical treatment for the injures he received subsequent to falling on June 18, 2020.

> I have attached hereto relevant documents from Mr. Wilson's medical chart in chronological order for the Court's review.

> Mr. Wilson transferred from the Bibb County Correctional Facility to the Easterling Correctional Facility on March 18, 2020. On April 13, 2020, Mr. Wilson was brought to the health care unit by Lieutenant McCovery for a body chart.

> Mr. Wilson advised the LPN performing the evaluation that he was wrongfully accused. The nurse, during the evaluation, noted no injuries to Mr. Wilson.

> On April 15, 2020, Wilson was admitted to the infirmary at the Easterling Correctional Facility complaining of abdominal pain.

> Mr. Wilson had a history of abdominal pain with nausea and vomiting and had in fact been admitted to the infirmary in March of 2020 complaining of the same symptoms.

On April 15, 2020, a complete metabolic panel was taken of Mr. Wilson.  Later in the day on April 15, 2020, a complete evaluation and physical examination was performed on Mr. Wilson by Laura Driggers, CRNP.

Mr. Wilson informed the nursing staff that the abdominal issues had stared the night before on April 14, 2020.

Due to Mr. Wilson's complaints of abdominal pain, an ultrasound of Mr. Wilson's gall bladder was ordered.  The presumed diagnosis was acute cholelithiasis with RUQ abdominal pain.

An x-ray was taken of Mr. Wilson's abdomen on April 17, 2020.  An ultrasound was also taken of Mr. Wilson's gall bladder.  The radiologist read the x-ray and ultrasound as follows:

Examination: Abdomen IV
Reason for exam: Nausea/vomiting
Findings:
There is a non-obstructive bowel gas pattern.  Mild increase feces in the colon.  Retained barium in the colon is also seen.  No renal stone is noted.
Impression:
Not obstructive bowl gas pattern
Exam: Ultrasound of the gall bladder
Technique:  Real time gray scale imaging of the gall bladder was performed.
Clinical data:  Acute cholelithiasis with right upper quadrant pain
Prior studies:  No prior studies are submitted
Findings:  The gall bladder measures 8.3 cm demonstrating no evidence of sludge or stones and a wall thickness of 2 mm.  The common bile duct measures 2 mm.
Impression: Sonographically unremarkable gall bladder
Recommendation: Follow up as clinically necessary.

I personally saw and evaluated Mr. Wilson both on April 16 and April 17, 2020.  I performed a complete physical evaluation of Mr. Wilson at that time. Mr. Wilson was kept in the infirmary for his evaluation due to his abdominal pain concerns.

On April 18, 2020, the nursing assessment tool notes that Mr. Wilson was feeling "better."  On April 19, 2020, Mr. Wilson was in fact discharged from the infirmary.

The medical records reveal that Mr. Wilson was seen frequently by myself as well as the nurses and medical staff at the Easterling Correctional Facility during the time that he was in the infirmary in April 2020 for his abdominal pain.

The medical records reveal that in May 2020, follow up appointments were made for Mr. Wilson to be seen by the medical staff where Mr. Wilson failed to show up for his appointments.

On April 18, 2020, two days after Mr. Wilson was admitted to the infirmary, Mr. Wilson completed and inmate grievance.  In his grievance, Mr. Wilson states as follows:

> I was taken to the infirmary April 14, 2020 – I was very dehydrated and wasn't keeping and fluids down – I told LT prior I couldn't breathe and I needed to see a doctor but no one came.  I tried to get my mother to call captain Lawson from the free world so that they could see me which is a security health hazard.  What if I would have died – then when I got to the infirmary, they put me on a liquid diet broth, Jello, and water – I got the orange Jello.  It had a spider which I bit down on and reported it to Nurse Jay and Officer Pope.  I still got the same Jello with a spider in it.  There wasn't nothing done about the situation.

The medical grievance was received by the health care unit on April 21, 2020.  A response was made to the grievance and returned to Mr. Wilson as follows:

> Mr. Wilson --this is a DOC issue. I will forward this grievance to the Captain and Wardens.

There is no indication that myself or any of the nurses had any prior notice that Mr. Wilson had found a spider in his Jello.  Regardless, this would not be a medical issue and there is nothing in the medical chart to indicate that the spider and any negative implications of Mr. Wilson's well being or his health treatment.

While Mr. Wilson was in the health care unit for his abdominal issues, he received excellent care and was in fact kept in the infirmary for a number of days where he was continuously monitored.  Mr. Wilson's medical treatment at no time was delayed or denied for his abdominal issues in April 2020.

I am further aware that Mr. Wilson alleges that in June 2020 he fractured his arm.

On June 18, 2020, Mr. Wilson completed a sick call request that stated as follows:

> I slipped in the shower on the black mold or whatever it is in the shower area and twisted my arm.  I feel like it's fractured and it's been two weeks and I still haven't heard from dental.  About pulling my teeth.  Thanks.

On the same date, June 18, 2020, Mr. Wilson completed a medical grievance that stated as follows:

> I wrote two or three sick calls to see about my arm.  I slipped in the shower and on slick spot on the mold or whatever it is in the shower and I throwed my arm.  The winter that I am burning (sp) in has led or something in it and it is breaking me out from my ? to the inside of my legs by my genitals.  It's not right.  I need to be seen and need cream or something.

A response was made to Wilson's grievance on June 24, 2020, and stated as follows:

> Mr. Wilson – You were called to HCU and assessed.  You will be scheduled to have an x-ray and then you will follow up with a provider if needed.

Mr. Wilson was seen and assessed on June 24, 2020.  Mr. Wilson informed the nurse that he had fallen but caught himself injuring his arm in the shower.   Wilson stated that he was in constant pain with his arm.  Mr. Wilson complained of pain upon tenderness but was fully able to move his fingers.  However, Mr. Wilson's face grimaced with movement.

On June 24, 2020, Mr. Wilson was provided with a sling for 14 days.

On June 26, 2020, Mr. Wilson had an x-ray which the radiologist read as follows:

> Examination: Right forearm 2V
> Reason for exam: Pain to right forearm.  Falling and caught himself by extending arm.
> Findings:
> There are acute non-displaced fractures of the mid radius and ulna seen.  There is no focal bone lesion.  Alignment is anatomic.  There is not soft tissue swelling for foreign body identified.
> Impression:
> Acute fractures of the mdi radius and ulna are noted.

A referral was made by Laura Driggers, CRNP for Mr. Wilson to be seen by an orthopedist with the presumed diagnosis of a fractured radius and ulna-right.

An appointment was made for Mr. Wilson to be seen by Dr. Chung, an orthopedist in Montgomery, Alabama.

However, on July 7, 2020, Mr. Wilson signed a Release of Responsibility form refusing to be seen by Dr. Chung.

On July 13, 2020, Mr. Wilson failed to show for his appointment with the medical provider even though he was called on numerous times to the dorm with regard to this medical appointment.

The notations from Laura Driggers, CRNP, dated July 8, 2020, stated that Mr. Wilson was scheduled for a follow-up appointment with me with regard to the fracture of his radius and ulna.  However, Ms. Driggers noted that Mr. Wilson had refused his orthopedic visit.

> At no time did I, or any of the medical staff at Easterling Correctional Facility, refuse to treat, see or provide necessary medical treatment to Mr. Wilson for his necessary medical needs.

> Mr. Wilson complained about pain in his arm and was x-rayed and an appointment was set up for Mr. Wilson to be seen by an outside specialist-orthopedist. However, Mr. Wilson, on numerous times, refused to be seen by the outside orthopedist.

> I have reviewed Mr. Wilson's medical chart, and in my opinion, as a physician licensed to practice medicine in the state of Alabama, Mr. Wilson has at all times been treated within the standard of care of physicians practicing medicine in the state of Alabama.

(Doc. 31-1 at pp. 1-8). Defendant Nurses Faulk and Junghans also testified by affidavit that based upon their review of Plaintiff's medical chart "he was treated at all times within the standard of care of nurses." (Docs. 31-2 at pp. 1-2; 31-3 at pp. 1-2). Both further confirmed that Plaintiff's "necessary nursing needs were never delayed nor denied." *Id.* Likewise, each testified that they were not aware that Plaintiff was served Jello with a spider in it, but that ensuring proper food preparation is outside of their responsibility as nurses. *Id.*

On June 18, 2020, Plaintiff filed a grievance complaining about continued pain in his arm and an untreated rash inside his legs. (Doc. 31-1 at p. 5; Doc. 31-1 at p. 66). Mona Payne, RN and Health Services Administrator at Easterling, testified that prior to June 18, 2020, Plaintiff never completed a sick call request or complained to any provider about the rash inside his legs. (Doc. 48-1 at pp. 1-3). Moreover, Plaintiff made no complaints, written or verbal, about this rash following the June 18, 2020, grievance where the rash was mentioned in conjunction with his arm pain. *Id.* Indeed, the Court's independent review of the medical records confirms no mention of this rash during the period between Plaintiff's transfer to Easterling on March 18, 2020, until June 18, 2020, when the grievance was filed, (doc. 31-1 at pp. 9- 65), and no mention of the rash following the June 18, 2020, grievance. (Doc 31-1- at pp. 66-78).

Rather, the bulk of Plaintiff's medical records demonstrate ongoing treatment from mid-April 2020 until early June 2020 for stomach pain and nausea for which he was seen a number of times, housed in the infirmary on a liquid diet, and consistently prescribed Pepto-Bismol and Zofran.  (Doc. 31-1 at pp. 9-65).  Following the June 18, 2020, grievance, the medical records demonstrate he received treatment for his fractured arm beginning June 24, 2020, when he was seen in the prison infirmary, was provided a sling for 14 days and scheduled for an x-ray on June 26, 2020. (Doc. 31-1 at pp. 6, 68-78).  Following the x-ray, which showed "actute non-displaced fractures of mid radius and ulna", Plaintiff was referred to Dr. Chung, an orthopedist in Montgomery, Alabama.  (Doc. 31-1 at pp. 6-7, 70-75).  On July 7, 2020, Plaintiff declined this appointment with Dr. Chung, by signing a Release of Responsibility Form. (Doc. 31-1 at pp. 7, 73).  Furthermore, the medical records confirm that Plaintiff failed to show up for his follow-up doctor's appointment at Easterling on July 13, 2020.  (Doc. 31-1 at pp. 7, 76-78).

Plaintiff also alleges that the Defendants failed to protect him from COVID-19 infection by other inmates.  (Doc. 37).  However, Plaintiff does not specifically state how he allegedly came into contact with infected individuals at Easterling.  Nor does he claim that he ever contracted COVID-19 himself.  *Id.*

Ruth Naglich, Associate Commissioner for Health Services for the Alabama Department of Corrections testified that from the outset of the pandemic in March 2020, ADOC worked to create and implement a plan to respond to the COVID-19 pandemic, both system wide and at Easterling. (Doc. 79-1 at pp. 1-16).  Further, ADOC focused its efforts on operational preparedness, education, increased cleaning and disinfection of facilities, screening, restriction of movement into facilities, and

securing and distributing hygiene, cleaning, and medical supplies. (Doc. 79-1 at pp. 3-8).

In addition to specific movement restrictions, education, and staffing restrictions, ADOC created and implemented protocols for testing inmates suspected of being COVID-19 positive, and quarantining and medically isolating inmates directly exposed to or testing positive for COVID-19. Decisions on whether to test an inmate rested with medical personnel based upon criteria developed by ADOC from CDC Guidance, and in coordination with the three (3) level quarantine protocol. (Doc. 79-1 at pp. 8-10).

Quarantine and testing occurred based on a three (3) tiered system. (Doc. 79-1 at pp. 10-13). Level one, also known as "watchful wait," requires inmates suspected of exposure to a COVID-19 positive person to be isolated from the general population and monitored for fever and other symptoms of COVID-19. Level one does not require testing. (Doc. 79-1 at p. 10). Level two requires an inmate who exhibits signs or symptoms of COVID-19 or has confirmed prolonged direct exposure to a person who has tested positive to be isolated and tested for COVID-19. (Doc. 79-1 at pp. 11-12). Level three requires medical quarantine for any inmate who tests positive for COVID-19. (Doc. 79-1 at pp. 12-13). Moreover, Warden Jones testified that that the Defendants and others employed at Easterling followed the protocol developed by the Alabama Department of Corrections and Wexford Health to keep Wilson and all inmates safe from COVID-19. (Doc. 77-1 at pp. 1-6). Additionally, Warden Jones confirms that at Easterling "inmates who tested positive were isolated and did not return to population until they were medical cleared."

(Doc. 67-1 at p. 2).  He further denied any knowledge of Plaintiff's claim about spiders in his Jello.  *Id.*

## B.  OFFICIAL CAPACITY

To the extent Plaintiff lodges claims against the Defendants in their official capacities and seeks monetary damages, these Defendants are entitled to absolute immunity.  Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).  As the Eleventh Circuit has held,

> the Eleventh Amendment prohibits federal courts from entertaining suits by private
> parties against States and their agencies [or employees]. There are two exceptions
> to this prohibition: where the state has waived its immunity or where Congress has
> abrogated that immunity. A State's consent to suit must be unequivocally expressed
> in the text of [a] relevant statute. Waiver may not be implied.  *Id.* Likewise,
> Congress' intent to abrogate the States' immunity from suit must be obvious from
> a clear legislative statement.

*Selensky v. Alabama*, 619 F. App'x 846, 848–49 (11th Cir. 2015) (internal quotation marks and citations omitted).  Thus, a state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated the State's immunity, *see Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996). Neither waiver nor abrogation applies here. The Alabama Constitution states that "the State of Alabama shall never be made a defendant in any court of law or equity." Ala. Const. Art. I, § 14.  The Supreme Court has recognized that this prohibits Alabama from waiving its immunity from suit. *Selensky*, 619 F. App'x at 849 (citing *Alabama v. Pugh,* 438 U.S. 781, 782 (1978) (consent is prohibited by the Alabama Constitution). "Alabama has not waived its Eleventh Amendment immunity in § 1983 cases, nor has Congress abated it." *Holmes v. Hale*, 701 F. App'x 751, 753 (11th Cir. 2017) (citing *Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1525 (11th Cir.1990)).

In light of the foregoing, all Defendants are entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Selensky*, 619 F. App'x at 849; *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) (holding that state officials sued in their official capacities are protected under the Eleventh Amendment from suit for damages); *Edwards v. Wallace Community College*, 49 F.3d 1517, 1524 (11th Cir. 1995) (holding that damages are unavailable from state official sued in his official capacity).   Accordingly, all claims against Defendants in their official capacities for monetary damages are due to be dismissed.

## C.   DELIBERATE INDIFFERENCE

### 1.   Medical Defendants

The court will now turn its attention to the Plaintiff's claim that the Medical Defendants treated him with deliberate indifference by failing to adequately treat his nausea and dehydration, and delaying treatment for his broken arm, and serving him Jello containing spider parts when he was housed in the prison infirmary.   In order to establish "deliberate indifference to [a] serious medical need . . . , Plaintiff[] must show: (1) a serious medical need; (2) the defendant['s] deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009).   When seeking relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248,1255 (11th Cir. 1999) (holding that, for liability to attach, the official must know of and then disregard an excessive risk to the prisoner). Regarding the objective component of a deliberate indifference claim, the plaintiff must first show

"an objectively 'serious medical need[]' . . . and second, that the response made by [the defendants] to that need was poor enough to constitute 'an unnecessary and wanton infliction of pain,' and not merely accidental inadequacy, 'negligen[ce] in diagnos[is] or treat[ment],' or even '[m]edical malpractice' actionable under state law." *Taylor*, 221 F.3d at 1258 (internal citations omitted).  To proceed on a claim challenging the constitutionality of medical care, "[t]he facts alleged must do more than contend medical malpractice, misdiagnosis, accidents, [or] poor exercise of medical judgment." *Daniels v. Williams*, 474 U.S. 327, 330–33 (1986).  Furthermore, the mere fact that an inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution.  *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985).

Besides the objective component, the Plaintiff must satisfy a subjective prong by showing that the Defendant acted with deliberate indifference. *Chandler v. Crosby,* 379 F. 3d 1278, 1289-90 (11th Cir. 2004).  This does not require that the prison official purposefully acted to cause harm, but it does involve something beyond mere negligence.  *Id.*  The Eleventh Circuit has recently clarified under the subjective prong, that a Plaintiff must demonstrate a Defendant "acted with more than gross negligence" to demonstrate deliberate indifference.  *Wade v. McDade*, 67 F. 4th 1363, 1373 (11th Cir. 2023) (granting summary judgment for nurses and holding that their failure to ensure inmate received his daily doses of anti-convulsion medicine did not rise to the level of "more than gross negligence") *citing Goebert v. Lee Cnty.,* 510 F.3d 1312, 1330 (11th Cir. 2007) ("an official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay.")(Quotation omitted).  Indeed, the Defendant must know of and disregard an "excessive risk to inmate health or safety."  *Farmer,* 511 U.S. at 837.  In other words, "the official must both be aware of facts from which the inference

could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Id; see also, Wade*, 67 F. 4th at 1374.

Based upon the Court's independent review of the medical records, the Court concludes that Plaintiff's claim of medical deliberate indifference fails. Indeed, the undisputed medical evidence demonstrates that Wilson was admitted and treated at the Easterling infirmary beginning April 15, 2020, for his nausea, dehydration and breathing problems until April 19, 2020, when he was discharged. (Doc. 31-1 at pp. 2-5). This treatment included an ultrasound, x-ray and complete metabolic panel from which Dr. Pouparinas, who examined him personally on April 16 and 17, 2020, diagnosed acute cholelithiasis. *Id.* The medical records also confirm that Plaintiff was prescribed Zofran and Pepto-Bismol for his stomach pain following his discharge from the infirmary through June 2020. (Doc. 31-1 at pp. 9-65). Further the record indicates that Plaintiff failed to keep his follow up appointments with Easterling medical staff in May, 2020. (Doc. 31-1 at p. 4). Thus, the record is devoid of evidence from which this Court could conclude that Defendants "acted with more than gross negligence" when providing medical treatment to Plaintiff for his nausea, dehydration and breathing problems. *Wade,* 67 F. 4th at 1373 (11th Cir. 2023).

Concerning the fracture of Plaintiff's arm, the record confirms that Plaintiff fell on June 18, 2020, and injured his arm. (Doc. 13 at p. 3). He completed a sick call request and a grievance on the same day complaining about his arm pain. (Doc. 31-1 at p. 5). The medical records demonstrate he received treatment for his fractured arm beginning June 24, 2020, when he was seen in the prison infirmary, was provided a sling for 14 days and scheduled for an x-ray on June 26, 2020. (Doc. 31-1 at pp. 6, 68-78). Following the x-ray, which showed "acute non-displaced fractures of mid radius and ulna", Plaintiff was referred to Dr. Chung, an orthopedist in Montgomery, Alabama. (Doc. 31-1 at pp. 6-7, 70-75). On July 7, 2020, Plaintiff declined this

appointment with Dr. Chung, by signing a Release of Responsibility form. (Doc. 31-1 at pp. 7, 73).  Furthermore, the medical records confirm that Plaintiff failed to show up for his follow-up doctor's appointment at Easterling on July 13, 2020.  (Doc. 31-1 at pp. 7, 76-78).

Plaintiff complains about the six-day delay from June 18, 2020 until June 24, 2020, when he was seen in the infirmary for his arm pain.  (Doc. 13 at p. 3).  In determining whether a delay in medical treatment constitutes deliberate indifference, courts consider the seriousness of the medical need, whether delay worsened the medical condition, and the reason for the delay. *See Goebert v. Lee Cty.*, 510 F.3d 1312, 1327 (11th Cir. 2007); *Farrow v. West*, 320 F.3d 1235, 1247 (11th Cir. 2003).  Additionally, when an inmate complains that a delay in medical treatment rises to the level of a constitutional violation, he "must place verifying medical evidence in the record" establishing the detrimental effect caused by the delay. *Surber v. Dixie Cty. Jail*, 206 F. App'x 931, 933 (11th Cir. 2006) (internal citation omitted).  The court concludes that Plaintiff's claims premised on delay of treatment also fail because there is no medical evidence in the record which demonstrates that the alleged delay caused any detrimental effect to Plaintiff.  *Surber,* 206 F. App'x at 933.  Indeed, following his receipt of the sling and x-ray confirming the fracture, Plaintiff failed to attend his appointment with Dr. Chung, the free-world doctor, and failed to keep his follo-up appointment with medical personnel at Easterling.  Furthermore, to the extent the Plaintiff alleges that he was due a different mode of medical treatment other than what he received, this does not amount to deliberate indifference. *Hamm,* 774 F.2d at 1575.  Accordingly, summary judgment is due to be granted as to all Medical Defendants on Plaintiff's claims for deliberate indifference.

### 2.   Correctional Defendant – Warden Crow

Likewise, the Court concludes that Plaintiff has failed to establish deliberate indifference on the part of Warden Crow.  Specifically, Wilson has not demonstrated that Warden Crow was

aware of facts establishing "an objectively serious medical need" nor that these he disregarded any known serious risk to Wilson's health.  *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk of harm to the inmate); *Quinones*, 145 F.3d at 168 (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference); *Farmer*, 511 U.S. at 838 (failure to alleviate significant risk that officer "should have perceived but did not" does not constitute deliberate indifference).  Consequently, summary judgment is due to be granted in favor of Warden Crow on Wilson's claim alleging deliberate indifference arising from his access to treatment for his medical conditions.

Summary judgment is also due to be granted in favor of Warden Crow on the cursory claim that Plaintiff was not kept safe from COVID-19 exposure while at Easterling.  Indeed, Plaintiff fails to explain how he allegedly came into contact with inmates or correctional personnel infected by COVID-19.  Nor does he claim that he was ever infected with COVID-19. The undisputed evidence demonstrates that ADOC had a plan and policy to address the COVID pandemic both system wide and at Easterling, and that this policy was followed at Easterling. (Doc. 79-1 at pp. 1-16).  Furthermore, Warden Jones testified unequivocally that at Easterling "inmates who tested positive were isolated and did not return to population until they were medically cleared."  (Doc. 67-1 at p. 2).

Also, Warden Jones denied any knowledge of Plaintiff's claim about spiders in his Jello. *Id*.  Indeed, this claim could be dismissed on that basis alone.  *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk of harm to the inmate).  Moreover, the Court notes that Plaintiff's claim regarding an instance of ingesting spiders

in his Jello, while unpleasant, does not, without more, demonstrate that his constitutional rights were violated. Indeed, the Constitution requires that prisoners be provided 'reasonably adequate food.'" *Hamm,* 774 F.2d at 1575 (citation and quotation marks omitted).  A well-balanced meal of enough nutritional value to preserve health satisfies this requirement. *Id*. "The fact that food occasionally contains foreign objects or sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation." *Id*. (citation and quotation marks omitted); *See also, Bennett v. Misner*, 2004 WL 2091473 *20 (D. Or. 2004) ("Neither isolated instances of food poisoning, temporary lapses in sanitary food service, nor service of meals contaminated with maggots are sufficiently serious to constitute an Eighth Amendment violation.").  Accordingly, summary judgment is also due to be granted in favor of Warden Jones on Plaintiff's claim about ingesting contaminated food.

## D.  **RESPONDEAT SUPERIOR**

Insofar as Wilson seeks to hold Warden Jones liable for the treatment provided by medical professionals, he is likewise entitled to no relief as

> [t]he law does not impose upon correctional officials a duty to directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong. *See Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir. 1977) (a medical treatment claim cannot be brought against managing officers of a prison absent allegations that they were personally connected with the alleged denial of treatment). Moreover, "supervisory [correctional] officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care. *See, e.g., Durmer v. O'Carroll*, 991 F.2d 64, 69 (3rd Cir. 1993); *White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988)." *Williams v. Limestone County, Ala.,* 198 Fed.Appx. 893, 897 (11th Cir. 2006).

*Cameron v. Allen*, et al., 525 F.Supp.2d 1302, 1307 (M.D. Ala. 2007).

Even assuming *arguendo* that Defendant Warden Crow exerted some control over the manner in which those persons responsible for the provision of medical treatment rendered such

treatment, the law is well settled "that Government officials may not be held liable for the unconstitutional conduct of their subordinates [or co-workers] under the theory of *respondeat superior* [or vicarious liability]. . . .   A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed [alongside,] by or under him, in the discharge of his official duties.  Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (internal quotation marks, citation and parentheses omitted); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (holding that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."); *Marsh,* 268 F.3d at 1035 (holding that a supervisory official "can have no respondeat superior liability for a section 1983 claim."); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir.2003) (concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (holding that 42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability.).  "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677, 129 S.Ct. 1949.  Thus, liability for actions of the Medical Defendants could attach to the Warden Crow only if he "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [their] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.

The record is clear that Warden Crow did not personally participate or have any involvement, direct or otherwise, in the medical treatment provided to Wilson. The evidentiary materials before the court demonstrate that medical personnel made all decisions relative to the treatment provided to Wilson and provided treatment to him in accordance with their professional judgment upon assessment of his physical condition. (Docs. 31-1 at pp. 1-8; 31-2 at pp. 1-2; 31-3 at pp. 1-2).

In light of the foregoing, Warden Crow can be held liable for decisions of medical personnel only if they undertook actions which bear a causal relationship to the purported violation of Wilson's constitutional rights. To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of the correctional defendants, Wilson must present sufficient evidence which would be admissible at trial of either "a history of widespread abuse [that] put[] [the defendants] on notice of the need to correct the alleged deprivation, and [they] fail[ed] to do so" or "a . . . custom or policy [that] result[ed] in deliberate indifference to [his medical needs], or . . . facts [that] support an inference that [the correctional defendants] directed the [facility's health care staff] to act unlawfully, or knew that [the staff] would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted). After extensive review of the pleadings and evidentiary materials submitted in this case, it is clear that Wilson has failed to meet this burden.

The record before the court contains no probative evidence to support an inference that Warden Crow directed medical personnel to act unlawfully or knew that they would act unlawfully and failed to stop such action. In addition, Wilson has presented no evidence of obvious, flagrant or rampant abuse of continuing duration regarding his receipt of medical treatment in the face of which these defendants failed to take corrective action; instead, the undisputed medical records

indicate that Wilson had continuous access to medical personnel and received treatment for his medical conditions. The undisputed records also demonstrate that the challenged course of medical treatment did not occur pursuant to a policy enacted by Warden Crow. Thus, the requisite causal connection does not exist in this case and liability under the custom or policy standard is not justified. *Cf. Employment Div. v. Smith*, 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990); *Turner v. Safely*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Accordingly, those claims against Warden Crow in his supervisory capacity also fail for the reasons stated above.

For the above stated reasons, it is the RECOMMENDATION of the Magistrate Judge that

1.    The Defendant's motions for summary judgment (Docs. 31, 36, 42, 48, 57, 58, 67, 73, 77, 79) be GRANTED.

2.    Judgment be GRANTED in favor of the Defendants.

3.    This case be DISMISSED with prejudice.

4.    Costs be taxed against the Plaintiff.

On or before **August 11, 2023**, the plaintiff may file objections to the Recommendation. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which he objects. Frivolous, conclusive or general objections will not be considered by the District Court. The plaintiff is advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11TH Cir. R. 3-1; *see Resolution*

*Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993)("When the magistrate provides such notice and a party still fails to object to the findings of fact and those findings are adopted by the district court the party may not challenge them on appeal in the absence of plain error or manifest injustice."); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 28th day of July, 2023.

   /s/  Charles S. Coody
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE